EFiled: Sep 28 2015 03:51PM EDT
Transaction ID 57930855
Case No. 10244-VCN

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CASPIAN SELECT CREDIT MASTER FUND LTD., a Cayman Islands exempted company, CASPIAN CAPITAL PARTNERS LP, a Delaware limited partnership, MARINER, LDC, a Cayman Islands limited duration company, and MARINER OPPORTUNITIES FUND LP, a Delaware limited partnership, on behalf of themselves, and derivatively by CASPIAN SELECT CREDIT MASTER FUND LTD. and MARINER, LDC, on behalf of KEY PLASTICS CORPORATION, | : : : : : : : : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | **C.A. No. 10244-VCN** |
| TERRENCE GOHL, JONATHAN BALL, EUGENE I. DAVIS, DR. REINER BEUTEL, DONALD C. CAMPION, CHRISTOPHER E. KEENAN, WAYZATA INVESTMENT PARTNERS LLC, WAYZATA OPPORTUNITIES FUND II, L.P., WAYZATA OPPORTUNITIES FUND OFFSHORE II, L.P., and KEY PLASTICS CORPORATION, a Delaware corporation, | : : : : : : : : : : : | |
| Defendants, | : : | |
| and | : : | |
| KEY PLASTICS CORPORATION, a Delaware corporation, | : : : | |
| Nominal Defendant. | : | |

# MEMORANDUM OPINION

Date Submitted:  May 4, 2015
Date Decided:  September 28, 2015

Jon E. Abramczyk, Esquire and Christopher P. Quinn, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Anthony L. Paccione, Esquire and Bonnie Lynn Chmil, Esquire of Katten Muchin Rosenman LLP, New York, New York, Attorneys for Plaintiffs.

Richard M. Beck, Esquire and Sean M. Brennecke, Esquire of Klehr Harrison Harvey Branzburg LLP, Wilmington, Delaware, Attorneys for Defendants Terrence Gohl, Jonathan Ball, Eugene I. Davis, Dr. Reiner Beutel, Donald C. Campion, Christopher E. Keenan, and Key Plastics Corporation.

Gregory V. Varallo, Esquire and Christopher H. Lyons, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Wayzata Investment Partners LLC, Wayzata Opportunities Fund II, L.P., and Wayzata Opportunities Fund Offshore II, L.P.

NOBLE, Vice Chancellor

Nominal Defendant Key Plastics Corporation ("Key Plastics" or the "Company") emerged from Chapter 11 bankruptcy with two groups of stockholders holding one class of stock. Defendants Wayzata Opportunities Fund II, L.P. ("Wayzata Opportunities") and Wayzata Opportunities Fund Offshore, II, L.P. ("Wayzata Offshore," and with Wayzata Opportunities, the "Wayzata Funds") collectively own approximately 91.5% of the stock. Various Plaintiffs hold the remainder.[1]

As part of its restructuring, Key Plastics entered into a term loan facility (the "Wayzata Term Loan") with Wayzata Opportunities. The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approved the Wayzata Term Loan which was set to expire in January 2011, had a borrowing cap of $25 million, and bore interest at an annual rate of LIBOR plus 11%. The loan was subsequently amended on five occasions to more than triple its amount, to extend its maturity, and to increase its interest rate. Defendants allegedly authorized those amendments on unfair terms to benefit the Wayzata entities at Plaintiffs' expense.[2] Plaintiffs brought this action, advancing claims for breaches

---

[1] Plaintiffs are Caspian Select Credit Master Fund Ltd.; Caspian Capital Partners LP; Mariner, LDC; and Mariner Opportunities Fund LP. Not all Plaintiffs currently hold Key Plastics stock, but all held shares at certain times relevant to the wrongdoing they allege.

[2] The Wayzata entities include the Wayzata Funds and their investment manager, Defendant Wayzata Investment Partners LLC ("Wayzata Partners").

1

of fiduciary duty, aiding and abetting those breaches, breaches of contract, and unjust enrichment. Defendants have moved to dismiss all claims.

## I. BACKGROUND

A. *The Parties*

Key Plastics is a global supplier of automotive components, headquartered in Michigan and incorporated in Delaware.[3] The Wayzata Funds are allegedly its controlling stockholders: Wayzata Opportunities and Wayzata Offshore hold 82.06% and 9.45% of the Company's stock, respectively. A stockholders agreement among the Company and its stockholders (the "Stockholders Agreement") grants the Wayzata Funds the power to nominate a majority of the Company's directors so long as they together own a majority of Key Plastics stock.

Both Wayzata Funds are managed by Wayzata Partners. Wayzata Partners "acts as agent of the Wayzata Funds, makes all decisions on behalf of the Wayzata Funds, receives management fees based on the performance of the Wayzata Funds, and controls the Wayzata Funds."[4] According to the Consolidated Financial

---

[3] Unless noted otherwise, the facts are drawn from the Verified Amended Complaint (the "Complaint" or "Compl.").

[4] Compl. ¶ 16. The allegation that Wayzata Partners acts as the Wayzata Funds' agent, yet controls those entities, creates some ambiguity. Taking the allegations in the Complaint as a whole, it appears that the funds operate under the will of Wayzata Partners.

Statements of Key Plastics L.L.C., for the year ended December 31, 2011, Wayzata Partners "controls a majority interest in Key Plastics Corporation."[5]

The remaining Defendants are officers and directors of Key Plastics. The Company's five-member board (the "Board") consists of Terrence Gohl ("Gohl"), Eugene I. Davis ("Davis"), Christopher E. Keenan ("Keenan"), Dr. Reiner Beutel ("Beutel"), and Donald C. Campion ("Campion").[6] The Board has the authority to appoint the Company's officers. Gohl serves as Chief Executive Officer ("CEO") and Jonathan Ball ("Ball") is the Company's Chief Financial Officer ("CFO").[7]

Plaintiffs have held 8.5% of Key Plastics's stock since February 2009, when, as part of its bankruptcy restructuring, the Company converted certain of its debts into equity.

B. *The Wayzata Term Loan*

On February 13, 2009, as part of a pre-packaged bankruptcy plan, Key Plastics entered into the Wayzata Term Loan with Wayzata Opportunities. Wayzata Partners, the loan's administrative agent, perfected a security interest on February 13, 2009, by filing a UCC financing statement with the Delaware

---

[5] *Id.*

[6] The Wayzata Funds nominated Keenan, Campion, and Davis as directors pursuant to their power under the Stockholders Agreement. Those directors have served on the Board since the Stockholders Agreement was executed.

[7] Ball is the only non-director individual defendant.

3

Secretary of State.[8]  As approved by the Bankruptcy Court, the Wayzata Term Loan provided for delayed-draw borrowings of up to $25 million at an annual interest rate of LIBOR plus 11%.  The loan was initially set to expire in January 2011, but was amended on five separate occasions, supposedly at the direction of, and on terms dictated by, Wayzata Partners, which drafted each amendment.  The amendments were as follows:

1. December 2, 2010: The maturity date was extended one year to January 31, 2012.
2. March 29, 2011: The loan commitment was increased to $35 million and the term was extended to January 31, 2013.  An option was established for the Company to pay interest in-kind ("PIK" interest), which allows the Company to pay Wayzata Opportunities in the form of additional debt.
3. October 17, 2011: The loan commitment was expanded to $55 million and the annual interest rate was increased to a minimum of 20% (LIBOR (minimum 4%) plus 16%).
4. January 19, 2012: The loan commitment was expanded to $75 million and the maturity date was extended to January 31, 2014.
5. September 12, 2013: The loan term was extended to January 31, 2016.

By August 31, 2014, the loan had an outstanding balance of $79,727,454, including $38,727,454 in accumulated PIK interest.  Plaintiffs allege that the Wayzata entities have employed the Wayzata Term Loan to extract value from Key Plastics at Plaintiffs' expense.  The Board supposedly approved the loan expansions on an uninformed basis and without considering the fairness of the

_____

[8] The loan was collateralized by a first priority security interest in all cash, deposit accounts, accounts receivable, inventory, equipment, and real property.

amendments to the Company. Although Board minutes reflect the Board's conclusions that the amendments were "on terms that [were] fair and reasonable" to Key Plastics, each amendment was approved without consideration of an independent fairness opinion or substantive fairness presentation, and options for cheaper financing were not adequately explored.[9]

## II. NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed the Amended Complaint on January 21, 2015, alleging direct and derivative claims against Defendants.[10] Counts I-V purport to state direct claims for breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, breaches of the Stockholders Agreement, and unjust enrichment. Counts VI-IX reassert those claims, other than breach of the Stockholders Agreement, derivatively.

In response, Defendants filed a joint Motion to Dismiss the Amended Complaint (the "Motion") under Court of Chancery Rules 12(b)(6), 23.1, and, with respect to Wayzata Offshore, 12(b)(2). The Court must now resolve (i) whether Plaintiffs' purportedly direct claims are actually direct or derivative, (ii) whether Plaintiffs have adequately alleged demand futility in relation to their derivative claims, (iii) whether Plaintiffs otherwise state claims upon which relief can be

---

[9] *See, e.g.*, Compl. ¶¶ 51, 57.

[10] Plaintiffs filed their first Verified Complaint on October 15, 2014. After Defendants moved to dismiss and filed an opening brief, Plaintiffs amended their complaint.

granted, and (iv) whether Wayzata Offshore is subject to personal jurisdiction in Delaware.

## III. ANALYSIS

A. *Plaintiffs' Purportedly Direct Fiduciary Duty Claims Must Be Dismissed Because They Are Exclusively Derivative in Nature*

Plaintiffs frame their first three counts, for breaches of fiduciary duty and for aiding and abetting breaches of fiduciary duty, as direct claims. They argue that the expansion of the Wayzata Term Loan was the "functional equivalent of a wrongful transfer of equity to Wayzata."[11] They read "Delaware authority . . . [to] hold[] that equity dilution claims are direct claims where, as here, the controlling stockholder is uniquely benefitted and the minority stockholder is uniquely harmed."[12]

To determine whether Plaintiffs' claims are derivative or direct, the Court must answer two related questions: "Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"[13] In limited circumstances, identical

---

[11] Pls.' Answering Br. in Opp'n to Mot. to Dismiss Verified Amended Compl. ("Pls.' Answering Br.") 15. Plaintiffs often refer to all Wayzata entities as "Wayzata."

[12] *Id.* at 13.

[13] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004).

6

facts may support both a direct and a derivative claim.[14]  However, to maintain a direct cause of action, a "stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[15]

Generally, claims for wrongful equity dilution are derivative in nature.[16] "Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction."[17]

> There is, however, at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character.  A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.  Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to

---

[14] *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 2011 WL 3371493, at *5 n.31 (Del. Ch. Aug. 5, 2011).
[15] *Tooley*, 845 A.2d at 1039.
[16] *Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008).
[17] *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006).

compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment—an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.[18]

In *Gentile*, our Supreme Court purposefully labeled this "species of corporate overpayment claim" as equity "extraction or expropriation," rather than mere dilution.[19] The Court adopted what it considered "a more blunt characterization" to capture "more accurately the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually . . . ."[20]

---

[18] *Id.* at 99-100.
[19] *Id.* at 102 n.26.
[20] *Id.*

Plaintiffs' claims do not fit neatly within the *Gentile* paradigm, where a controlling stockholder causes the corporation to issue "excessive" shares of its stock.[21] Technically, Plaintiffs do not challenge any stock issuance by Key Plastics. They argue instead that by expanding the Wayzata Term Loan, Defendants expropriated equity from the Company: "the exorbitant PIK interest on the Wayzata Term Loan accrued to the exclusive benefit of Wayzata, it effectively

---

[21] *See, e.g.*, *Gatz v. Ponsoldt*, 925 A.2d 1265, 1274 (Del. 2007) (observing that *Gentile* recognized a direct claim "where a significant or controlling stockholder causes the corporation to engage in a transaction wherein shares having more value than what the corporation received in exchange are issued to the controller, thereby increasing the controller's percentage of stock ownership at the public shareholders' expense . . . ."); *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 330 (Del. 1993) ("The injury sustained, the plaintiffs allege, is a loss manifested by both cash-value and voting power dilution."); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 658 (Del. Ch. 2013) ("In my view, the Delaware Supreme Court's decisions preserve stockholder standing to pursue individual challenges to self-interested stock issuances when the facts alleged support an actionable claim for breach of the duty of loyalty."); *Zimmerman v. Crothall*, 2012 WL 707238, at *14 (Del. Ch. Mar. 5, 2012) ("The essential teaching of *Gentile* is that in situations where a corporation issues excessive shares to a controlling shareholder in exchange for an asset of lesser value, minority shareholders can bring *both* direct and derivative claims."); *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008) ("[T]he harm *Gentile* . . . seek[s] to remedy can only arise when a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration."); *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736, at *5 (Del. Ch. July 11, 2007) ("More particularly, Filipowski and Roszak caused a direct harm to the Plaintiffs by the 'extraction' of economic value and residual voting power and a 'redistribution' of the economic value and voting power to themselves as controlling shareholders.").

provided the controller with a unilateral option to increase its stake in the Company and to dilute [Plaintiffs], the only minority stockholder[s]."[22]

Plaintiffs' attempt to bring their claims within the *Gentile* framework fails because at its core, their grievance is that the Company overpaid on the Wayzata Term Loan, thus diluting the value of its stock. "A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders."[23] Under *Tooley*, Key Plastics suffered the alleged harm and would receive the benefit of any recovery. Plaintiffs try to avoid that result by characterizing the Wayzata Term Loan as an equity transaction because for *Gentile* to apply, the alleged overpayment must take the form of corporate stock.[24] They suggest treating the loan as having no fixed maturity date because it has been extended on multiple occasions, and as having no real repayment schedule because the Company may pay interest with additional debt.[25] However, those allegations are insufficient to transform the Wayzata Term Loan, facially a debt instrument, into equity for determining the nature of Plaintiffs' claims.[26] *Gentile* considered the transfer of voting power as an

---

[22] Pls.' Answering Br. 14. However, the PIK interest option allows the Company to pay in the form of additional debt, not equity.

[23] *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988).

[24] *Gentile*, 906 A.2d at 100.

[25] Compl. ¶ 80.

[26] The Court need not accept conclusory allegations in the Complaint.

10

important factor in finding a direct claim.[27]   Here, extending and expanding the loan did not affect Plaintiffs' voting power; Defendants' alleged wrongs had no impact on the relative equity holdings (and any associated rights) of Key Plastics's stockholders.

Further, *Gentile* cannot stand for the proposition that Plaintiffs suggest, *i.e.*, that a direct claim arises whenever a controlling stockholder extracts and expropriates economic value from a company to its benefit and the minority stockholders' detriment.[28]   Such an exception would largely swallow the rule that claims of corporate overpayment are derivative—stockholders could maintain a suit directly whenever the corporation transacts with a controller on allegedly unfair terms.[29]   Accordingly, Counts I-III of the Amended Complaint must be dismissed because they fail to state direct claims.

---

[27] *Gentile*, 906 A.2d at 100 ("Because the shares representing the 'overpayment' embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder.").

[28] *See supra* text accompanying note 12.

[29] *Cf. Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 55-56 (Del. Ch. 2015) (concluding the challenges to an allegedly unfair services agreement that a company entered into with affiliates of its controlling stockholder constituted derivative claims).

B. *Plaintiffs Have Sufficiently Demonstrated That Presuit Demand
on the Board Would Have Been Futile*

Court of Chancery Rule 23.1, which governs derivative pleadings, requires that "[t]he complaint . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." When a stockholder seeks to challenge a decision of the board on which demand could have been, but was not, made, it must plead particularized facts from which the Court may infer reason to doubt (i) the disinterestedness or independence of the directors or (ii) that the challenged transaction resulted from a valid exercise of business judgment.[30] Rule 23.1's pleading standard is more stringent than notice pleading, but does not require a plaintiff to plead evidence.[31] As with a

---

[30] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984). When a plaintiff does not challenge a decision of the board in place when the complaint is filed, the test set forth in *Rales v. Blasband,* 634 A.2d 927 (Del. 1993), applies. The *Rales* test controls where a plaintiff alleges that the board wrongfully took no action. That standard requires the Court to "determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. Defendants have suggested that *Rales* provides the proper standard in relation to some of Plaintiffs' allegations. As will be seen, the result would be the same under *Rales*.

[31] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

12

Rule 12(b)(6) motion, the Court accepts all well-pled allegations as true and draws every reasonable inference in the plaintiff's favor.[32]

Plaintiffs did not make a demand on the Board before commencing this action. When determining whether demand was excused, the Court initially presumes that directors are independent, *i.e.*, that they considered "the corporate merits of the subject matter before the board rather than extraneous considerations or influences."[33] Plaintiffs must rebut that presumption because generally, "a claim of the corporation should be evaluated by the board of directors to determine if pursuit of the claim is in the corporation's best interests."[34] Plaintiffs' burden may be met by "pleading facts that support a reasonable inference that the director is beholden to a controlling person or so under their influence that their discretion would be sterilized."[35] Here, Plaintiffs have alleged facts that create reasons to doubt the independence of three Board members: Keenan, Davis, and Campion. Those directors constitute a majority of the Board on which demand would be made and as will be seen, they allegedly approved unfair transactions with the

---

[32] *In re China Auto. Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *5 (Del. Ch. Aug. 30, 2013).

[33] *Aronson*, 473 A.2d at 816.

[34] *Brehm*, 746 A.2d at 257.

[35] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (internal quotation marks omitted).

Company's controlling stockholders. Plaintiffs have successfully established demand futility under *Aronson*'s first prong.[36]

1. There Is Reason to Doubt Keenan's Independence

The Wayzata Funds nominated Keenan to the Board in February 2009. He is a principal of Wayzata Partners, Wayzata Opportunities's investment manager. Wayzata Opportunities owns a controlling interest in the Company and is the counterparty to the Wayzata Term Loan. Plaintiffs allege that Keenan's position at Wayzata Partners places him on both sides of the Wayzata Term Loan and that he stands to benefit from that self-dealing transaction.

Defendants argue that Keenan is not a principal of Wayzata Opportunities, the controlling stockholder with whom the Company transacted, but of Wayzata Partners, a separate, but related, entity. They attack as mere speculation the allegation in the Amended Complaint that Keenan "stands to reap additional financial rewards and other benefits from this self-dealing transaction . . . ."[37] Of course, Plaintiffs cannot meet the Rule 23.1 pleading standard with simple conjecture. However, they have alleged particularized facts from which the Court can infer Keenan's interest or lack of independence.

---

[36] Whether demand would be excused under *Aronson*'s second prong (a doubtful proposition) need not be determined. Further, it is unnecessary to determine the independence of the other two directors for demand futility purposes because Plaintiffs have adequately pleaded that a Board majority is not independent.
[37] *See* Compl. ¶ 103.

14

Wayzata Opportunities is the lender under the Wayzata Loan and stands, as a controlling stockholder, on both sides of that transaction. Wayzata Partners allegedly controls Wayzata Opportunities and receives management fees based on its performance.[38] If Wayzata Opportunities benefits from the terms of the Wayzata Term Loan, then so does Wayzata Partners. If Wayzata Partners benefits, then so does Keenan. Or so Plaintiffs' theory, which is based on reasonable inferences from their allegations, goes. Plaintiffs have adequately alleged reason to doubt Keenan's independence for demand futility purposes.[39]

2. There Is Reason to Doubt the Independence of Davis and Campion

Davis and Campion were also appointed to the Board by the Wayzata Funds in February 2009. They, like Wayzata Partners, are in the business of restructuring distressed companies. Both directors have enjoyed advantageous business affiliations with Wayzata Partners and one can reasonably infer that they expect those favorable relations to continue. Davis is the CEO of a consulting firm that specializes, like Wayzata Partners, in restructuring distressed companies. Allegedly, Wayzata Partners generates a substantial amount of business for that firm. Furthermore, the Wayzata entities have appointed Davis to the boards of companies in which various Wayzata funds are majority or significant

---

[38] Compl. ¶ 16.
[39] As will be seen, Plaintiffs have also adequately alleged (at this early stage) that Wayzata Partners itself breached fiduciary duties to the Company.

15

stockholders. Those companies include McLeodUSA, Anchor Glass Container Corporation, Merisant Company, RathGibson, and Atlantic Express Transportation Corporation. Davis has served on certain boards alongside Wayzata Partners personnel, such as that of Grede Holdings, LLC, where Keenan was a director. Wayzata Partners also appointed Davis as trustee in charge of liquidating assets of Fabric Estates Inc.[40]

As with Davis, Wayzata Partners has appointed Campion, a restructuring professional, to many boards of directors. Those include Grede Holdings, Special Devices, Inc., and Mississippi River Pulp LLC. Campion also served on McLeodUSA's board alongside a partner of Wayzata Partners. Plaintiffs contend that both Campion and Davis lack independence because of their "past business dealings with Wayzata Partners and [their] expectation[s] of future business dealings with Wayzata Partners, given that [they] and Wayzata Partners are in the same business—restructuring distressed companies."[41]

Defendants correctly observe that "[a]llegations of . . . a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt

---

[40] Fabrics Estates Inc.'s Chapter 11 liquidation plan was approved following the sale of substantially all of its assets to affiliates of debtor-in-possession lender Wayzata Partners. Compl. ¶ 107.
[41] Compl. ¶¶ 108, 110.

about a director's independence."[42]  In some circumstances, however, a director's "previous affiliations with [a controlling stockholder] or companies which [the controller] controlled" may raise questions regarding the director's ability to function independently.[43]  Here, the Amended Complaint creates a reasonable doubt as to Campion's and Davis's independence.

As explained, Campion and Davis operate in the same line of business as Wayzata Partners, which has nominated them to numerous boards of directors. Both have engaged in various business dealings with Wayzata Partners, and expect future business relations.  Wayzata Partners manages investment funds that acquire controlling interests in distressed companies.  One can reasonably infer that Campion and Davis expect to be considered for directorships in companies the Wayzata funds acquire in the future.  Even if "the actual extent of [their] relationships [with Wayzata Partners] is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss."[44]

---

[42] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

[43] *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997).

[44] *In re New Valley Corp.*, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001).  As noted, Wayzata Partners is a separate entity from the funds that it manages. Nonetheless, Plaintiffs' allegations concerning Wayzata Partners's alleged control over the execution of the Wayzata Term Loan allow the Court to infer, for purposes of a Rule 23.1 motion to dismiss, that Campion's and Davis's connections with Wayzata Partners rendered them non-independent.

Because there is a reasonable doubt regarding the independence of three Board members who approved the allegedly wrongful loan amendments, demand is excused, and dismissal under Rule 23.1 is not warranted.[45]

## C. *Breach of Fiduciary Duty Claims*

Having determined that demand on the Board was not required, the Court must now consider whether Plaintiffs' breach of fiduciary duty claims should be dismissed for failure to state a claim upon which relief may be granted. "[A] complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim."[46] Plaintiffs must meet the "reasonable conceivability" standard where the Court "(1) accept[s] all well pleaded factual allegations as true, (2) accept[s] even vague allegations as 'well pleaded' if they

---

[45] "Directors must not only be independent, but must act independently." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002). "It is the care, attention and sense of individual responsibility to the performance of one's duties . . . that generally touches on independence." *Aronson*, 473 A.2d at 816. Plaintiffs allege that each amendment of the Wayzata Term Loan "was approved . . . without any independent fairness opinion or action by a majority of independent directors and without any consideration of alternative financing scenarios." Compl. ¶ 57. These allegations may raise questions regarding whether the Board operated independently, but are not necessary for the Court to determine that demand was excused.

To the extent that the *Rales* test governs allegations that the Board failed to take action (*i.e.,* not paying down Key Plastics's debt), the outcome is the same. There is a reasonable doubt that, when the Complaint was filed, a majority of the board could have properly exercised its independent judgment in responding to a demand.

[46] *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008).

18

give the opposing party notice of the claim, [and] (3) draw[s] all reasonable inferences in favor of the non-moving party."[47]  A claim will be dismissed only if Plaintiffs "would not be entitled to recover under any reasonably conceivable set of circumstances."[48]

Count VI asserts breaches of fiduciary duties against all Defendants derivatively on behalf of Key Plastics.  It alleges that

> Defendants failed to act in the best interests of the Company and breached their fiduciary duties by, among other things, voting to approve or permitting, without fairly evaluating, the subject transactions, voting to approve or permitting transactions that were not entirely fair, expanding the Wayzata Term Loan at an exorbitant interest rate far exceeding comparable market rates to the detriment of the Company, purposefully ignoring, disregarding, or failing to pursue, refinancing alternatives, and refusing to significantly pay down this onerous debt with the Company's substantial cash.[49]

Allegedly, Defendants "also breached their fiduciary duties by elevating and favoring the interests of Wayzata over the interests of the Company, and by making incomplete disclosure in dealings with Plaintiffs to enable Plaintiffs to protect the Company's interests and legal rights."[50]

---

[47] *Cent. Mortg. Co. v. Morgan Stanley Mort. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).
[48] *Id.*
[49] Compl. ¶ 151.
[50] Compl. ¶ 153.

Count VII also alleges fiduciary breaches, specifically against the Wayzata-affiliated Defendants: the Wayzata entities and Keenan. Those Defendants allegedly

> breached their fiduciary duties by, among other things, participating in . . . self-dealing and unfair transactions that favored their interests over the interests of the Company, exercising their control over Key Plastics and the other Defendants to cause the Company to approve the expansions of the Wayzata Term Loan on unfair terms, prohibiting the Company from pursuing refinancing alternatives and significantly paying down this onerous debt with the Company's substantial cash, and using corporate assets and opportunities and otherwise wasting corporate assets for their own personal gain.[51]

Counts VII and VI are duplicative as against the Wayzata-affiliated Defendants; Count VI will therefore be dismissed with respect to them.

1. Count VII Survives

Plaintiffs have sufficiently pleaded that as a holder of 82.06% of Key Plastics's stock, Wayzata Opportunities is a controlling stockholder with a duty to place "the best interest of the corporation and its shareholders . . . over any interest [it] possesse[s] . . . and not shared by the stockholders generally."[52] That duty of loyalty is implicated here, where Wayzata Opportunities "appear[ed] on both sides of a transaction [and allegedly] receive[d] a personal benefit not shared by all

---

[51] Compl. ¶ 157.

[52] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

shareholders."[53]  There is doubt regarding the independence of a majority of the Board that approved the allegedly self-dealing transactions.  Entire fairness, with Defendants bearing the burden of proof, is the operative standard of review.[54]  To survive the Motion, Plaintiffs allegations must indicate that the amendments to the Wayzata Term Loan were not entirely fair.[55]  "The concept of fairness has two basic aspects: fair dealing and fair price."[56]  At this stage, Plaintiffs have satisfied their burden, and the breach of fiduciary duty claim against Wayzata Opportunities will survive.[57]

Plaintiffs allege that by 2011, "the interest rate on the Wayzata Term Loan was exorbitantly above-market."[58]  Supposedly, financing was available at significantly lower rates, and in April 2012, the Company obtained separate third-party financing at an interest rate less than half of the Wayzata Term Loan. Around the time the loan was amended for the fourth time, "at least two similarly situated auto suppliers, American Axle and Visteon, obtained unsecured debt financing of much longer duration at the substantially lower prevailing interest

---

[53] *Id.* (internal quotation marks omitted).
[54] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).
[55] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).
[56] *Id.*
[57] As will been seen next, the claim also survives against the other Wayzata entities.
[58] Compl. ¶ 61.

rates of 6.75% and 7.75%, respectively."[59] By spring 2013, the rates on secured and unsecured debt for comparable companies were approximately 50% to 80% of the Wayzata Term Loan's rate. The rates on secured debt were at least 75% to 90% below the loan's rate.[60] Apparently, seven financial institutions pursued the Company to refinance its debt at a fraction of its "very high rate."[61] One major bank proposed a $40 million revolving credit facility and a $13 million term loan facility on favorable terms at interest rates as low as 2.25% and 2.75%, respectively.[62] These allegations raise questions regarding the fairness of the interest rate on the Wayzata Term Loan.[63]

The process undertaken to approve the amendments was also allegedly unfair:

> Each amendment was approved by Key Plastics' Board of Directors without any independent fairness opinion or action by a majority of independent directors and without any consideration of alternative financing scenarios. Further, the Board approved each amendment without exploring, or while purposefully ignoring, alternative financing opportunities. Indeed, beginning with the second amendment in March 2011, the Board purported to document, in conclusory fashion, the fairness and reasonableness of the transaction and, with subsequent amendments, purported to ratify and approve all prior and subsequent actions related to the transaction.[64]

---

[59] Compl. ¶ 65.

[60] Compl. ¶ 67.

[61] Compl. ¶ 70.

[62] *Id.*

[63] *See* Compl. ¶¶ 61-71. Plaintiffs wisely do not contend that the initial interest rate was unfair at the time it was approved by the Bankruptcy Court.

[64] Compl. ¶ 57.

The allegations in the Complaint present a timing issue. The first reference to cheaper available financing is the loan the Company entered into with a third party on April 4, 2012. That date was after all amendments, other than the fifth; the third amendment, which had increased the Wayzata Term Loan's interest rate, had occurred six months prior. Although Plaintiffs allege that the Company was aware as early as late 2011 that lower rates were available, they provide little factual support for that assertion.

If the business judgment standard applied, then Plaintiffs would likely have failed to state a claim. However, the amendments are subject to an entire fairness review, with the burden of proving fairness on Defendants. That standard makes it difficult to dismiss Plaintiffs' claims at this stage. Plaintiffs allege that Wayzata Partners dictated the terms of each amendment. The Board minutes suggest that the amendments were approved without considering the fairness of the amendments or available alternative financing. The minutes reflect no deliberation or discussion concerning the amendments, and no independent fairness opinions were sought.

The process-related allegations are enough here, where the Company transacted with a controller and on the controller's terms. That cheaper financing was soon available buttresses Plaintiffs' claims. Count VII therefore survives as

against Wayzata Opportunities; the next questions are whether it continues against Wayzata Partners and Wayzata Offshore.

Defendants argue that Wayzata Partners owes no fiduciary duties to the Company's minority stockholders because it is not a Key Plastics stockholder, and clearly is not a Company director. Thus, the only alleged bases for imposing fiduciary duties on it do not exist.[65] Plaintiffs counter that Wayzata Partners controls the Wayzata Funds, which together hold 91.5% of the Company's stock. By virtue of its control over those stockholders, Wayzata Partners allegedly controls Key Plastics, and owes fiduciary obligations to the Company. The analysis espoused by this Court in *In re Primedia Inc. Derivative Litigation*,[66] suggests that in this Rule 12(b)(6) context, Plaintiffs have adequately pleaded that Wayzata Partners owes fiduciary duties to Key Plastics.

In *Primedia*, the Court reasonably inferred that defendant Kohlberg Kravis Roberts & Co. L.P. ("KKR") controlled, through two of its affiliates, nominal defendant, Primedia, Inc. ("Primedia").[67] KKR's affiliates acted as general partners of various investment partnerships, which collectively held approximately

---

[65] *See* Compl. ¶ 156 ("The Wayzata-affiliated Defendants, Wayzata Partners, the Wayzata Funds and Mr. Keenan, as controlling stockholders and/or directors of Key Plastics, are fiduciaries of the Company.").
[66] 910 A.2d 248 (Del. Ch. 2006).
[67] *Id.* at 257.

60% of Primedia's stock.[68] The affiliates possessed sole voting and investment power with respect to those shares.

> Importantly, every general partner of KKR Associates and every member of KKR 1996 GP is a member of the limited liability company that serves as the general partner of KKR. Because of this managerial overlap, KKR allegedly controls KKR Associates and KKR 1996 GP and dictates Primedia's most fundamental business decisions. Indeed, Primedia's SEC filings state that "*Kohlberg Kravis Roberts & Co. L.P., or KKR, has control of our common stock and has the power to elect all the members of our board of directors and to approve any action requiring stockholder approval*.[69]

Although neither KKR nor its affiliates directly held any Primedia stock, "[g]iven the threshold standard at [the Rule 12(b)(6)] stage of the litigation, the facts clearly support[ed] a reasonable inference that KKR exerted actual control over Primedia during the course of the" challenged transaction.[70] Allegations of control over the corporate action challenged in the complaint were sufficient to survive the motion to dismiss.[71]

The allegations that Wayzata Partners exercised control over the Company likewise suffice to withstand Defendants' Motion. Plaintiffs have alleged that as investment manager for the Wayzata Funds, Wayzata Partners "makes all decisions on behalf of the Wayzata Funds, receives management fees based on the

---

[68] *Id.* at 251.
[69] *Id.* KKR Associates and KKR 1996 GP were the two KKR affiliates.
[70] *Id.* at 257-58.
[71] *Id.* at 257.

25

performance of the Wayzata Funds, and controls the Wayzata Funds."[72] Wayzata Partners has allegedly "dominated and controlled the Board of Directors and the operations of the Company" and "has the authority to appoint the officers of the Company . . . [and has] hand-picked each officer of the Company, including Messrs. Gohl, Ball and Davis."[73] Wayzata Partners supposedly directed the expansion of the Wayzata Term Loan, and drafted each amendment.[74] Key Plastics L.L.C.'s consolidated financial statements for the year ending December 31, 2011, indicated that "as the manager of certain funds, [Wayzata Partners] controls a majority interest in Key Plastics Corporation."[75] As noted, *supra* Section III.B, Plaintiffs have sufficiently alleged that a majority of the Board that approved the loan amendments lacked independence from Wayzata Partners, allowing the Court to infer Wayzata Partners's control over the amendments to the Wayzata Term Loan.[76] Based on the facts alleged in the Amended Complaint, the Court can reasonably infer that Wayzata Partners exercised control over Key

---

[72] Compl. ¶ 16.

[73] Compl. ¶¶ 32-33.

[74] Compl. ¶ 43.

[75] Compl. ¶ 16. "Whether or not such statement[] ultimately [is] attributable to [Wayzata Partners, its] mere presence in the context of a Rule 12(b)(6) motion implicates [Wayzata Partners] as a controlling stockholder . . . ." *Primedia*, 910 A.2d at 258.

[76] *See Primedia*, 910 A.2d at 258-59 ("The particular course of dealing alleged in the complaint supports an inference that KKR exerted its power over Primedia's directors in connection with the challenged transactions.").

Plastics and used that control to its benefit, and to Plaintiffs' detriment. Count VII therefore survives against Wayzata Partners.

Count VII also survives against Wayzata Offshore.[77] Defendants argue that as an only 9.45% stockholder, Wayzata Offshore owes no fiduciary duties to the Company. However, at this procedural stage, the Court cannot sufficiently disentangle the Wayzata Funds to conclude conclusively that Wayzata Offshore owes no fiduciary duties to Key Plastics. Plaintiffs have alleged that "Wayzata Opportunities and Wayzata Offshore are investment funds and the controlling stockholders of Key Plastics, together holding approximately 91.5% of the Company's issued and outstanding common stock."[78] Of course, "formalism matters in the area of entity law,"[79] the Wayzata Funds are separate entities, and Wayzata Offshore itself only owns 9.45% of the Company's stock. However, the Stockholders Agreement gives both funds the right to nominate a majority of the Board so long as they collectively own at least fifty percent of Key Plastics's outstanding stock. Given its apparent ability, along with Wayzata Opportunities,

---

[77] The Court concludes that Wayzata Offshore is subject to personal jurisdiction in Delaware. *See infra*, Section III.H. That determination is a condition precedent to addressing whether Plaintiffs have stated a claim. *Branson v. Exide Elecs. Corp.*, 625 A.2d 267, 269 (Del. 1993).

[78] Compl. ¶ 15.

[79] *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011).

to appoint three members to the Company's Board, the fiduciary duty claim against Wayzata Offshore survives.

Count VII also survives against Defendant Keenan for the reasons discussed next.

### 2. Count VI Survives in Part

Count VI can be read as asserting claims against the individual Defendants for both duty of care and duty of loyalty violations. A Section 102(b)(7) exculpatory provision in Key Plastics's certificate of incorporation protects its directors against claims that exclusively assert a breach of the duty of care.[80] However, Plaintiffs' allegations that Defendants "breached their fiduciary duties by elevating and favoring the interests of Wayzata over the interests of the Company" sound in the duty of loyalty. Because there is reason to doubt that Keenan, Davis, and Campion exercised independent judgment when approving the supposedly unfair loan amendments, breach of loyalty claims survive against them.[81] The claim also survives against Gohl, Key Plastics's CEO. Gohl was appointed to his executive position by the Wayzata entities and is allegedly "beholden to Wayzata, who controls the Company and the Board, for his position as CEO, with its attendant compensation and benefits, on which he depends for his

---

[80] *See Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002).

[81] Again, because Count VI is duplicative of Count VII with regard to Keenan, Count VI is dismissed as against him.

livelihood."[82]  Those allegations allow the Court reasonably to infer that Gohl approved the challenged transactions for improper reasons, thus breaching his duty of loyalty.[83]

However, the breach of fiduciary duty count must be dismissed as against the remaining director, Beutel, who was not nominated to the Board by the Wayzata entities.  In the Amended Complaint, Plaintiffs suggested that he "likely is beholden to Wayzata" because the Wayzata entities appointed the majority of the Board members who nominated him.  Plaintiffs also alleged that he voted in lock-step with the other directors with respect to the Wayzata Term Loan amendments.[84]  The Court cannot reasonably infer from those bare allegations that Beutel, a "seemingly independent director[,] approved a conflicted transaction for improper reasons . . . ."[85]  Because Plaintiffs have pleaded no facts to support an inference that Beutel breached his duty of loyalty, and Beutel is protected from

---

[82] Compl. ¶ 104.

[83] *Cf. In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002) (holding that demand was excused on company's CEO because "to accept such a demand would require him to decide to have [the company] sue [its controlling stockholder], an act that would displease a majority stockholder in a position to displace him from his lucrative CEO position").  That Plaintiffs have not alleged the magnitude of Gohl's compensation is not fatal because they have alleged that he is a full-time executive employee who depends on his position for his livelihood. *Id.*

[84] Compl. ¶ 111.

[85] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1186-87 (Del. 2015).

duty of care claims by the Company's Section 102(b)(7) provision, the claims against Beutel will be dismissed.[86]

The remaining individual Defendant is Ball, Key Plastics's CFO. As a Company officer, but not a director, Ball "owes to the corporation identical fiduciary duties of care and loyalty as owed by directors, [but] . . . does not benefit from the protections of [the] Section 102(b)(7) exculpatory provision . . . ."[87] Therefore, the claims against him will survive if Plaintiffs have adequately alleged a violation of care or loyalty.[88] Plaintiffs claim to have done so, arguing that

> Ball knew the Company was paying Wayzata an exorbitant above-market rate and that refinancing was in the best interest of the Company, yet Ball bent to the will of Wayzata, ceasing refinancing efforts and taking no steps to protect the Company or [Plaintiffs] in blatant disregard of his fiduciary obligations to both.[89]

To establish that a corporate fiduciary acted in a manner that breached the duty of care, a plaintiff must show that the fiduciary acted with (i) gross negligence, *i.e.,* "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[90] A fiduciary might also be liable for inaction, but only if the plaintiff can satisfy the

---

[86] *Id.* at 1187. Notably, Plaintiffs did not contest Beutel's independence in their answering brief.

[87] *McPadden*, 964 A.2d at 1275.

[88] *Id.* at 1275-76.

[89] Pls.' Answering Br. 36-37.

[90] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (internal quotation marks omitted).

"extremely high standard" of "show[ing] a lack of good faith as evidenced by sustained or systematic failure . . . to exercise reasonable oversight."[91]  Here, Plaintiffs' allegations are insufficient to support an inference that Ball breached his duty of care.  Ball allegedly breached his fiduciary duties by

> (i) permitting the subject transactions which took place under his watch to be approved without being fairly evaluated; (ii) permitting transactions that were not entirely fair; (iii) permitting the expansion of the Wayzata Term Loan at an exorbitant interest rate far exceeding comparable market rates to the detriment of the Company; (iv) purposefully ignoring, disregarding, or failing to pursue, refinancing alternatives; (v) refusing to pay down, with any material significance, this onerous debt with the Company's substantial cash; (vi) enabling Wayzata to extract considerable value and additional equity by accruing tens of millions of dollars of PIK interest to Wayzata's sole and exclusive benefit; and (vii) making incomplete disclosures in dealings with Plaintiffs.[92]

Plaintiffs also point out that during Ball's tenure as CFO, the Company never engaged a broker or other third party to help it secure additional financing, and never defined a population of possible lenders or prepared a request for a proposal.[93]  Ball supposedly bent to the will of the Wayzata entities and "refused to authorize the Company to significantly pay down any of" its expensive debt.[94]

As an initial matter, it is doubtful that Ball could have prevented the alleged wrongs from occurring.  As CFO, Ball could not have controlled the Board's

---

[91] *Id.* (internal quotation marks omitted).
[92] Compl. ¶ 29.
[93] Compl. ¶ 66.
[94] Pls.' Answering Br. 37-38.

decision making, and the Board manages the Company's business and affairs. The Board authorized the amendments to the Wayzata Term Loan, and Ball operated at the direction of the Board. Regardless of whether Ball could have done more to protect Plaintiffs, the Court cannot reasonably infer from the Amended Complaint that he acted with gross negligence or with conscious disregard for his duties. Plaintiffs have alleged that during relevant periods of time, Ball communicated with banks and other financial institutions regarding financing at rates lower than that of the Wayzata Term Loan.[95] In 2012, the Company even entered into a loan with a third party at a lower rate than the Wayzata Term Loan. Whether Ball could have done more, or negotiated harder, is irrelevant where the allegations cannot support an inference that he acted with the required gross misconduct. The breach of fiduciary duty claim against Ball must therefore be dismissed.[96]

Breach of fiduciary duty claims thus survive against all Defendants except for Ball and Beutel. Count VII governs the claims against the Wayzata entities and Keenan; Count VI controls against the other Defendants.

---

[95] Compl. ¶ 59.
[96] Unlike Gohl, Ball (a non-director) did not approve the challenged transactions, and the Court cannot reasonably infer a loyalty breach from the allegations in the Complaint.

D. *Claims for Aiding and Abetting Fiduciary Breaches*

Count VIII asserts claims for aiding and abetting breaches of fiduciary duty against Wayzata Partners and Ball. An aiding and abetting claim requires "(1) the existence of a fiduciary relationship, (2) [that] the fiduciary breached its duty, (3) [that] a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) [that] damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[97]

Ball cannot be held liable for aiding and abetting a fiduciary breach because "as an executive officer, *i.e.*, the CFO of [Key Plastics], [Ball] himself owes fiduciary duties to the corporation, and therefore any conduct of his rising to the level of aiding and abetting would be a breach of his own fiduciary duties."[98] Accordingly, the aiding and abetting count against him will be dismissed.

As established above, it is reasonably conceivable that Wayzata Partners owes fiduciary duties to Key Plastics. If it does, then it cannot be liable under an aiding and abetting theory. However, it may be determined, on a more developed record, that Wayzata Partners cannot be considered a controller with concomitant fiduciary duties. If that is ultimately the case, then Plaintiffs may still have an

---

[97] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002).
[98] *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at \*13 (Del. Ch. Nov. 3, 2014). Plaintiffs appear to have conceded this point by failing to address it in their reply brief. *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at \*43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

aiding and abetting claim against it, supposing they otherwise state a claim. At this procedural stage, Plaintiffs have sufficiently pleaded an aiding and abetting claim against Wayzata Partners. Plaintiffs have asserted the existence of controlling stockholders (*i.e.*, the Wayzata Funds) that breached their fiduciary duties to the Company, that Wayzata Partners participated in the breach, and that Plaintiffs suffered resulting damages. Wayzata Partners allegedly prepared each amendment to the Wayzata Term Loan and dictated the terms.[99] The loan amendments allegedly depressed the value of Plaintiffs' equity in Key Plastics. Assuming that Wayzata Partners does not directly owe fiduciary duties to the Company, it may be liable for aiding and abetting the alleged fiduciary breaches. Count VIII therefore survives solely against Wayzata Partners.

### E. *Defendants' Laches Defense*

Defendants contend that the doctrine of laches bars Plaintiffs from challenging the first two amendments to the Wayzata Term Loan.[100] "Unless timely filing is excused by a recognized tolling doctrine, a plaintiff must file a claim for breach of fiduciary duty within three years of the conduct that gives rise to the claim."[101] The first two amendments to the Wayzata Term Loan occurred on December 2, 2010, and on March 29, 2011. Defendants argue that because

---

[99] *See, e.g.*, Compl. ¶ 56.
[100] Plaintiffs are not challenging the entry into the loan.
[101] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013).

Plaintiffs' initial complaint was not filed until October 16, 2014, challenges to those amendments are time-barred.

"[A]ffirmative defenses, such as laches, are not ordinarily well-suited for treatment on" a Rule 12(b)(6) motion to dismiss.[102] "Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate."[103] Although Plaintiffs bear the burden of pleading specific facts to avoid the time bar, the Court must view the well-pleaded facts in their favor.[104] Plaintiffs argue that several tolling doctrines extend the presumptive limitations period for their breach of fiduciary duty claims.

They assert that the three-year limitations period was tolled during the pendency of a Section 220 action they brought against the Company. Because they served their Section 220 demand on April 26, 2013,[105] Plaintiffs contend that causes of action accruing on or after April 26, 2010, are timely.[106] Defendants point out that Plaintiffs received Key Plastics's 2011 financial statements, which disclosed amendments to the Wayzata Term Loan, on August 20, 2012.

---

[102] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).

[103] *Id.* at 183-84.

[104] *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *2 (Del. Ch. Jan. 24, 2005).

[105] Compl. ¶ 89.

[106] *See, e.g.*, *Sutherland v. Sutherland*, 2009 WL 857468, at *5 (Del. Ch. Mar. 23, 2009) ("The applicable three-year statute of limitations was tolled, however, during the pendency of the plaintiff's Section 220 action.").

Supposedly, that put Plaintiffs on notice of the alleged wrongs before initiating their Section 220 suit, and the Section 220 tolling doctrine is inapplicable.

Even accepting Defendants' argument, Plaintiffs have also invoked equitable tolling whereby "the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary."[107] Plaintiffs have alleged that the amendments to the Wayzata Term Loan constituted wrongful self-dealing and that Defendants owed them fiduciary duties. Defendants failed to provide information timely to Plaintiffs regarding the loan amendments, and when financial statements were eventually provided (putting Plaintiffs on inquiry notice), the alleged wrongdoing had already occurred. Given the factual allegations in the Complaint, the Court cannot conclude conclusively that any of Plaintiffs' claims are time barred.[108]

F. *Breaches of the Stockholders Agreement*

Count IV charges Key Plastics and the Wayzata entities with breaching Sections 8.11 and 8.12 of the Stockholders Agreement. Section 8.11 provides

---

[107] *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).

[108] There is debate over what Plaintiffs knew and when they knew it. This uncertainty highlights why it may be difficult to deal with a laches defense on a Rule 12(b)(6) motion to dismiss. Plaintiffs also argued for tolling under a theory of fraudulent concealment. Whether they have adequately alleged fraud need not be addressed because their other tolling theories suffice for now to keep their claims alive.

Plaintiffs with certain preemptive rights in the event "the Company (or any subsidiary of the Company) wishes to issue and sell any equity interests or shares of capital stock or any equity security convertible into or exchangeable for equity interests or capital stock . . . to any Wayzata Party . . . ."[109] Plaintiffs allege that

> By causing the Company to issue additional equity concealed as exorbitant PIK interest which compounds in a priority position on the extended and expanded Wayzata Term Loan, the Company and Wayzata breached the Stockholders Agreement by not offering such additional equity to Plaintiffs and destroyed the economic and equity interest of Plaintiffs (to Wayzata's sole benefit).[110]

Defendants point out that Section 8.11 imposes obligations on Key Plastics, but not on Wayzata: "the Company shall also offer such New Securities to the DDJ Parties and any other Holder that is an 'accredited investor.'" The Amended Complaint thus fails to state a claim against the Wayzata entities in relation to Section 8.11.[111]

Plaintiffs' allegations against the Company are also without merit. The Wayzata Term Loan is not an equity interest, capital stock, or an equity security convertible into or exchangeable for equity interests or capital stock. It has a

---

[109] Transmittal Aff. of Christopher H. Lyons in Supp. of Opening Br. in Supp. of Defs.' Mots. to Dismiss the Compl. Ex. 5 (Stockholders Agmt.).
[110] Compl. ¶ 137.
[111] Plaintiffs appear to recognize this deficiency: "While these [breach of contract] allegations may be insufficient to state a breach of contract claim against Wayzata, they are sufficient to support [Plaintiffs'] claim that Wayzata breached its fiduciary duties to Key Plastics and [Plaintiffs] by causing the Company not to enforce the terms of its contract with [Plaintiffs]." Pls.' Answering Br. 53.

maturity date and a schedule of interest payments; technically, it has the hallmarks

of a debt instrument. Plaintiffs do attempt to characterize the loan as equity rather

than debt:

> [T]he Wayzata Term Loan contained all the hallmarks of an equity transaction: an insider who controls the Company; no fixed maturity since the Wayzata-controlled Company continuously and repeatedly extended the repayment date; and no real schedule of interest payments since interest PIKs virtually in perpetuity. Indeed, the Company recommended to one potential lender that it treat this "debt" as "quasi-equity," and Wayzata itself later characterized its stake in the Company as "shareholder junior capital," not debt, when it instructed the Company to omit the Wayzata debt from capitalization tables to be included in the Company's request for proposals for refinancing the Wayzata Term Loan.[112]

However, even accepting Plaintiffs' allegations as true, and drawing all

reasonable inferences in their favor, they fail to state a claim for breach of

Section 8.11 of the Stockholders Agreement. The meaning of Section 8.11 is clear

and undisputed. Even assuming that the Wayzata Term Loan possesses some

characteristics associated with equity, the loan falls outside Section 8.11's scope.

Perhaps Defendants attempted to avoid Section 8.11 inequitably by issuing

themselves debt that would function in some respects like equity; nonetheless,

doing so would not constitute a breach of the unambiguous terms of the

---

[112] Compl. ¶ 80.

Stockholders Agreement.[113] Plaintiffs have therefore failed to state a claim related to Section 8.11.[114]

Turning to the second alleged breach of the Stockholders Agreement, Section 8.12 entitles Plaintiffs to some of the Company's financial information on a quarterly and annual basis. The information must be provided as soon as available, but, respectively, no later than 45 days after the end of each quarterly accounting period or no later than 120 days after the conclusion of the fiscal year. Plaintiffs allege that the Company and the Wayzata entities failed to provide them with that information, or provided it late, thereby concealing misconduct from Plaintiffs. Like Section 8.11, Section 8.12 imposes obligations on the Company, and not the Wayzata entities.[115] The claim that the Wayzata entities breached Section 8.12 must therefore be dismissed.[116]

With regard to the Company, Defendants argue that Plaintiffs cannot establish any harm from its alleged failure to comply with Section 8.12. New York

---

[113] Plaintiffs appear to recognize that the Wayzata Term Loan cannot be equated to equity of Key Plastics. *See, e.g.*, Compl. ¶ 78 ("[The PIK interest] accrues solely to the exclusive benefit of Wayzata, growing the Company's overall *debt balance* at an exponential rate and drastically reducing the value of and diluting [Plaintiffs'] equity as Wayzata's claim compounds *in a priority position*.") (emphasis added).

[114] *See supra* Section III.A (observing differences between expanding the Wayzata Term Loan and issuing additional equity).

[115] Stockholders Agmt. § 8.12(a) ("The Company shall provide to each Holder for so long as such Holder owns any of the Common Shares, the following information . . . .").

[116] *See supra* note 111 (noting Plaintiffs' apparent recognition of the inadequacy of their breach of contract claims against Wayzata).

law, which governs the Stockholders Agreement, requires a plaintiff to allege damages to state a breach of contract claim.[117] "There is no requirement that the measure of damages be stated in the complaint so long as facts are alleged from which damages may properly be inferred."[118] Here, the Court can reasonably infer from the Amended Complaint that Plaintiffs suffered damages. Plaintiffs allege that they were ignorant of the Wayzata Term Loan's expansion until summer 2012, when they demanded financials after an unjustified 20-month gap during which the Company failed to provide information. Not until their belated receipt of the financials did Plaintiffs learn that Defendants had tripled the loan's borrowing limit, increased its interest rate, instituted the PIK option, and extended its term by years. The lack of transparency allegedly allowed the Wayzata entities to enrich themselves at Plaintiffs' expense. Additionally, Plaintiffs have requested specific performance pursuant to Article VII of the Stockholders Agreement, which provides that

> [i]n the event of a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any of the parties hereto, the other parties shall . . . be entitled . . . to a temporary and/or permanent injunction, without showing any actual damage or that monetary damages would not provide an adequate remedy, and/or a decree for specific performance . . . .

---

[117] *See, e.g.*, *Israel v. Wood Dolson Co.*, 134 N.E.2d 97, 99 (N.Y. 1956).
[118] *A.S. Rampell, Inc. v. Hyster Co.*, 144 N.E.2d 371, 380 (N.Y. 1957).

At the current procedural stage, Plaintiffs have sufficiently stated a claim that Key Plastics breached Section 8.12 of the Stockholders Agreement. That is the sole piece of Count IV to survive Defendants' Motion.

G. *Unjust Enrichment Claims*

The Amended Complaint attempts to state both a direct claim and a derivative claim against the Wayzata entities for unjust enrichment. Count V, asserting the direct claim, must be dismissed for the reasons articulated in Section III.A above. Defendants' alleged wrongs directly impacted Key Plastics; any injury that Plaintiffs suffered was the indirect result of their stock ownership.[119] The next question is whether Count IX, the corollary derivative claim, can survive.[120]

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[121] For Plaintiffs' derivative claim to survive, they must demonstrate "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of

---

[119] *See, e.g.*, *Metro. Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *8-9 (Del. Ch. Dec. 20. 2012) (holding that both unjust enrichment and fiduciary duty claims were derivative because plaintiffs' injury (the dilution of their equity) was a function of the pro rata investment). As established above, this case is not within the *Gentile* exception.

[120] As already established, Plaintiffs have adequately pleaded demand futility.

[121] *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *22 (Del. Ch. May 29, 2015) (internal quotation marks omitted).

justification, and (5) the absence of a remedy provided by law."[122]  "At the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—*i.e.,* where both claims are premised on the same purported breach of fiduciary duty—is frequently treated in the same manner when resolving a motion to dismiss."[123]

Count IX is largely duplicative of Count VII "because there is no alleged unjust enrichment separate or distinct from the alleged breach of fiduciary duty."[124] As determined, *supra* Section III.C, Plaintiffs have adequately pleaded that the Wayzata entities breached their fiduciary duties with respect to expansion of the Wayzata Term Loan.  Wayzata Opportunities is the counterparty to the Wayzata Term Loan and Wayzata Partners receives management fees based on the performance of its funds.  They allegedly caused the Company to overpay on the loan to enrich themselves at Key Plastics's expense.[125]  The relation between their

---

[122] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[123] *Calma v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015).  Of course, Plaintiffs cannot obtain a double recovery.  For now, both theories of liability can proceed despite being based on identical facts.  This is different from Counts VI and VII being duplicative as against the Wayzata-related Defendants.  Those counts made identical fiduciary duty claims, based on identical facts.

[124] *Id.* at 592.

[125] Each Defendant's potential liability under this count would be limited to the amount by which it was directly enriched at Plaintiffs' expense.  For example, Plaintiffs allege that Wayzata Partners has been enriched by higher management fees due to the Wayzata Funds' increased performance.  Wayzata Partners would not be liable to Plaintiffs, under an unjust enrichment theory, for losses above that amount.

42

alleged enrichment and Plaintiffs' impoverishment is clear and taking Plaintiffs' allegations as true, there was no justification. It is thus reasonably conceivable that Wayzata Partners and Wayzata Opportunities have been unjustly enriched. On the other hand, Plaintiffs have failed to allege how Wayzata Offshore has been directly enriched at their expense.[126] The unjust enrichment claim will be dismissed as against it.

## H. *Personal Jurisdiction over Wayzata Offshore*

Defendants argue that Wayzata Offshore, a Cayman Islands exempted limited partnership, is not subject to personal jurisdiction in Delaware.[127] Plaintiffs bear the burden of establishing a basis for this Court's jurisdiction over Wayzata Offshore.[128] The Court must be satisfied that Delaware's Long Arm Statute[129] is applicable and that subjecting Wayzata Offshore to jurisdiction in Delaware comports with the Due Process Clause of the Fourteenth Amendment.[130] To meet their burden, Plaintiffs evoke the conspiracy theory of jurisdiction, under which

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state

---

[126] Plaintiffs appear to recognize the weakness of the unjust enrichment claim against Wayzata Offshore: "The extent to which Wayzata Offshore benefited from such actions is clouded by the lack of discovery from this offshore investment vehicle." Pls.' Answering Br. 59.

[127] Compl. ¶ 14. Its principal place of business is also in the Cayman Islands.

[128] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005).

[129] 10 *Del. C.* § 3104(c)(1).

[130] *AeroGlobal Capital Mgmt., LLC*, 871 A.2d at 438.

law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[131]

The conspiracy theory "is based on the legal principle that one conspirator's acts are attributable to the other conspirators."[132] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[133] Because the five *Istituto Bancario* elements functionally encompass both the statutory prong and the constitutional prong of the jurisdictional test, "if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs . . . ."[134] The conspiracy theory test is "a

---

[131] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

[132] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[133] *Istituto Bancario*, 449 A.2d at 222. The Long Arm Statue provides jurisdiction over a defendant who "in person or through an agent . . . [t]ransacts any business or performs any character of work or service in this State . . . [or c]auses tortious injury in the State by an act or omission in this State." 10 *Del. C.* § 3104(c)(1), (c)(3).

[134] *Vitrus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *13 (Del. Ch. Feb. 11, 2015).

strict test with a narrow scope, and, as a result, factual proof of each enumerated element is required."[135]

Here, Plaintiffs have satisfied *Istituto Bancario*'s five factors, rendering Wayzata Offshore subject to personal jurisdiction in Delaware. The Court "analyze[s] the elements of the five-part conspiracy theory test using the deferential factual standard of a motion to dismiss, as limited by the more exacting factual requirements of the conspiracy theory."[136] The first two factors require evidence that Wayzata Offshore was a member of a conspiracy.[137] Taking all inferences from the specifically alleged facts in Plaintiffs' favor, it is conceivable that the Wayzata entities operated collectively to profit from Key Plastics at Plaintiffs' expense. As established, *supra* Section III.C, it is conceivable that Wayzata Offshore breached its fiduciary duty in furtherance of the alleged scheme. It is also reasonably conceivable that Wayzata Partners's April 3, 2012, filing of a UCC financing statement related to the Wayzata Term Loan's collateral was an act in furtherance of the supposed conspiracy.[138] Knowledge of that act can be

---

[135] *Matthew v. Laudamiel*, 2012 WL 605589, at *7 (Del. Ch. Feb. 21, 2012).

[136] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *6 (Del. Ch. Dec. 1, 2009).

[137] A civil conspiracy involves "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a proximate result thereof." *Zirn v. VLI Corp.*, 1989 WL 79963, at *9 (Del. Ch. July 17, 1989).

[138] Defendants argue that the filing was made in connection with Wayzata Opportunities's agreement to subordinate its security interests so that the Company

imputed to Wayzata Offshore because Wayzata Partners allegedly acts as its agent.[139] Wayzata Offshore is thus subject to personal jurisdiction in Delaware for the claims alleged against it in the Complaint.

## IV. CONCLUSION

Counts I, II, III, and V will be dismissed because although pleaded as direct claims, they are exclusively derivative in nature. Count IV will be dismissed as against the Wayzata entities. It survives against the Company in part; Plaintiffs have stated a claim for breach of Section 8.12 of the Stockholders Agreement, but not for breach of Section 8.11.

---

could obtain financing on favorable terms. They argue that "the filing in which Wayzata, for no consideration, waived $10 million of its rights to allow a third party to take a debt position, which not only is not alleged to be wrong, but is held up as a model of what should have happened" cannot be viewed as an act in furtherance of a conspiracy. Tr. of Oral Argument on Defs.' Mot. to Dismiss and Mot. to Stay Discovery 84. However, Plaintiffs do allege that consideration was provided: "In connection with this transaction, the Wayzata Term Loan was amended a fifth time to secure Wayzata's consent to the transaction." Compl. ¶ 64. If Wayzata subordinated its interests in order to obtain an allegedly wrongful extension of the Wayzata Term Loan, then the UCC filing can be deemed an act in furtherance of the alleged conspiracy.

[139] It is reasonably conceivable that Wayzata Partners was acting within the scope of its agency when it made the UCC filing. Although it is easier to conceive Wayzata Partners's actions as within the scope of its agency with respect to Wayzata Opportunities, the relationships among the entities make it difficult to draw lines at this procedural stage. Plaintiffs allege facts from which the Court may infer that Wayzata Partners used both Wayzata Funds to extract value from the Company.

Count VI survives against Defendants Gohl, Davis, and Campion. It will be dismissed as against Defendants Ball and Beutel for failing to state a claim against them, and it will be dismissed with respect to the Wayzata entities and Keenan because it is duplicative of Count VII, which survives against those Defendants.

Count VIII survives against Wayzata Partners but will be dismissed as to Defendant Ball. Finally, Count IX survives against Wayzata Opportunities and Wayzata Partners; it will be dismissed as against Wayzata Offshore.

Counsel are requested to confer and to submit an implementing form of order.

47